**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION AT TOLEDO**

| | |
|---|---|
| **KATHLEEN THOMPSON**, <br> 1885 Kemp Rd. N. <br> Elida, OH 45807 <br><br> and <br><br> **JEREMY THOMPSON**, <br> 1885 Kemp Rd. N. <br> Elida, OH 45807 <br><br>        Plaintiffs, <br><br>    v. <br><br> **NATIONSTAR MORTGAGE LLC, d/b/a MR. COOPER**, <br> c/o Corporation Service Company <br> 50 W. Broad St., Ste. 1330 <br> Columbus, OH 43215 <br><br>       Defendant. | Case No. <br><br> Judge <br><br><br> **COMPLAINT FOR DAMAGES** <br><br> **JURY DEMAND ENDORSED HEREON** |

Plaintiffs Kathleen Thompson and Jeremy Thompson, through counsel, for their *Complaint for Damages* against Defendant Nationstar Mortgage LLC d/b/a Mr. Cooper, state as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.    Plaintiffs Kathleen Thompson and Jeremy Thompson (collectively, "Plaintiffs" or the "Thompsons") are the owners of residential real property, located at and commonly known as 1884 Kemp Rd. N., Elida OH 45807 (the "Home").

2.    Defendant Nationstar Mortgage LLC d/b/a Mr. Cooper ("Defendant" or "Mr. Cooper") is a foreign limited liability company incorporated under the laws of the State of Delaware that maintains its headquarters and principal place of business at 8950 Cypress Waters Blvd., Dallas, TX 75019.

3.     Mr. Cooper is the servicer of a note executed by the Thompsons (the "Note") and of a mortgage on the Home that secures said note (the "Mortgage") (collectively, the "Loan"). A copy of the Loan is attached as **Exhibit 1**.

4.     Mr. Cooper has been the servicer of the Loan since February 4, 2019.

5.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as this action arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA) and Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq.* ("RESPA").

6.     This Court has supplemental jurisdiction to hear any state law claims that are plead herein or that may subsequently arise pursuant to 28 U.S.C. § 1367.

7.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## SUMMARY OF CLAIMS

8.     This action is filed to enforce regulations promulgated by the Consumer Financial Protection Bureau (CFPB) and implemented pursuant to 12 U.S.C. § 2605(f) that became effective on January 10, 2014, specifically, 12 C.F.R. § 1024.1, et seq. ("Regulation X").

9.     In January 2013, the CFPB issued a number of final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111-203, 124 Stat. 1376 (2010).

10.     Specifically, on January 17, 2013, the CFPB issued the Real Estate Settlement Procedures Act Mortgage Servicing Final Rules, 78 F.R. 10695 (Regulation X) (February 14, 2013), which became effective on January 10, 2014.

11.     Mortgage servicers are prohibited from failing "to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties." 12

U.S.C. § 2605(k)(1)(C).

12.     Mortgage servicers are prohibited from failing "to comply with any other obligation found by the [CFPB], by regulation, to be appropriate to carry out the consumer protection purposes of [RESPA]." 12 U.S.C. § 2605(k)(1)(E).

13.     Mr. Cooper is a mortgage servicer as defined by RESPA and Regulation X. 12 U.S.C. § 2605(i)(2); 12 C.F.R. § 1024.2(b).

14.     The Loan is a "federally related mortgage loan" as defined by RESPA and Regulation X. 12 U.S.C. § 2602(1); 12 C.F.R. § 1024.2(b).

15.     The Loan is not a "reverse mortgage transaction" as defined by RESPA and Regulation X. 12 C.F.R. § 1024.31; *see* 12 C.F.R. § 1026.33(a) (Regulation Z).

16.     The Loan is secured by the Home which is the Thompsons' principal residence. 12 U.S.C. § 1024.30(c)(2).

17.     Mr. Cooper is subject to the requirements of RESPA and Regulation X, and does not qualify for the exception for "small servicers"—as defined by 12 C.F.R. § 1026.41(e)(4)—nor for the exemption for a "qualified lender"—as defined by 12 C.F.R. § 617.7000.

18.     The Thompsons assert claims for relief against Mr. Cooper for violations of the specific rules under Regulation X, as set forth, *infra*.

19.     The Thompsons have a private right action under RESPA pursuant to 12 U.S.C. § 2605(f) for the claimed violations and such action provides for remedies including actual damages, statutory damages, and attorneys' fees and costs.

20.     The Thompsons assert statutory claims for violations of the Residential Mortgage Lending Act, R.C. 1322.01, *et seq.* (RMLA).

## **FACTUAL BACKGROUND**

**(The Thompsons' Financial Difficulties and Attempts to Apply for a Loan Modification)**

21.     Mr. Cooper obtained servicing rights to the Loan effective February 4, 2019, from non-party Pacific Union Financial, LLC.

22.     Due to financial difficulties brought on by the COVID-19 pandemic, the Thompsons had difficulty remitting their payments due and owing on the Loan and requested forbearance relief from Mr. Cooper on or around March 31, 2020.

23.     On or about April 8, 2020, Mr. Cooper sent correspondence to the Thompsons approving them for a Forbearance Plan effective for three (3) months from April 1, 2020 (the "Forbearance"). *See*, a copy of such correspondence, attached as **Exhibit 2**.

24.     Still under financial duress, the Thompsons sought and received at least two (2) further extensions of the Forbearance which were approved on or about August 26, 2020 and December 11, 2020.

25.     As the Forbearance was to expire, the Thompsons sought more permanent loss mitigation relief from Mr. Cooper in the form of a permanent loan modification.

26.     In early 2021, the Thompsons submitted a loss mitigation application to Mr. Cooper in order to be reviewed for any and all loss mitigation options available to them ("Application #1").

27.      Upon the submission of Application #1, Mr. Cooper began to repeatedly request information that the Thompsons had already provided.

28.     The Thompsons explained Mr. Cooper's repeated requests, as well as their frustration with the same in regard to Application #1 in their hardship letter dated May 11, 2021, wherein the Thompson explain that Mr. Cooper has failed to acknowledge receiving items submitted via mail, failed to advise the Thompsons that a profit and loss statement would be

required until advising the Thompsons to phone Mr. Cooper on May 11, 2021, and repeatedly (inaccurately) claiming that the Thompsons were the owners of a business despite repeated averments to the contrary. *See*, a copy of this correspondence attached as, **Exhibit 3**.

29.     On July 8, 2021, Jonathan Hrubetz, a Manager with Mr. Cooper, sent email correspondence to the Thompsons stating that the Thompsons needed to submit an "unemployment award letter with maximum benefit amount reflecting the award letter" or a letter of explanation as to why it could not be provided. *See*, a copy of such email communication, attached as **Exhibit 4**.[1]

30.     Minutes later, that same day, Mr. Hrubetz emailed the Thompsons *again* to now claim that "[u]pon further review, it does appear to me that you have recently sent [the unemployment letter] in", that he was "sending your package to Underwriting for review", and that "no further action is needed". *See*, a copy of such email communication, attached as **Exhibit 5**.

31.     Despite claiming on July 8, 2021, that the Thompsons had submitted all necessary information, on July 18, 2021, Mr. Hrubetz again emailed the Thompsons, this time claiming that the unemployment letter previously acknowledged as sufficient was not sufficient, and requesting other items as well. *See*, a copy of such correspondence, attached as **Exhibit 6**.

32.     For months, the Thompsons attempted to comply with Mr. Coopers requests for information necessary to complete Application #1, but were consistently met with frustrating obstructions from Mr. Cooper such as, *inter alia*, misplaced documents, requests for information already provided, unclear and contradictory requests or instructions as to what needed to be

---

[1] As detailed in Exhibit 8, *infra*, the Borrower was not in possession of such an award letter so the Thompsons, at the request of Mr. Cooper and in satisfaction of such requests, sent in proof of the award deposits as well as requested pages of Mrs. Thompson's online unemployment file on numerous occasions.

submitted or what any purported defects were with information submitted.

33.     On August 3, 2021, the Thompsons filed for Chapter 7 bankruptcy protection in the United States Bankruptcy Court for the Northern District of Ohio, in case number 21-31454-maw (the "Bankruptcy").

34.     Following the Bankruptcy, the Borrowers continued to try to work with Mr. Cooper to obtain a loan modification.

35.     On or about September 27, 2021, the Thompsons' Bankruptcy counsel submitted authorization forms requested by Mr. Cooper's Bankruptcy Department authorizing Mr. Cooper to have direct communication with the Thompsons so that the Thompsons could resume attempts to obtain a loan modification. *See*, a copy of this communication, attached as **Exhibit 7**.

36.     On October 18, 2021, the Thompsons telephoned Mr. Cooper to confirm that Mr. Cooper had received the authorization forms from their Bankruptcy counsel and to receive an update on the modification process. *See*, email correspondence from the Thompsons to Mr. Cooper dated October 18, 2021, attached as **Exhibit 8**.

37.     Mr. Cooper confirmed it had received the authorizations from the Thompsons Bankruptcy counsel and informed the Thompsons that Application #1 had been closed for failure to provide requested documentation. *See*, Exhibit 8.

38.     Mr. Cooper instructed the Thompsons to submit a new loss mitigation application and begin the process anew. *See*, Exhibit 8.

39.     The Thompsons subsequently submitted a new loss mitigation application on October 19, 2021 ("Application #2").

40.     On November 5, 2021, Ebony Pinson, a Manager at Mr. Cooper, emailed the Thompsons to state that they needed an explanation of the "supportive Living income on the 2020

Tax Return" and a simple profit and loss statement, if a current business, or a simple letter of explanation otherwise. *See*, a copy of such email correspondence, attached as **Exhibit 9**.

41.     Ms. Pinson also requested the next pay stubs available for Mrs. Thompson's income. *See*, Exhibit 9.

42.     On November 7, 2021, the Thompsons replied to Mr. Cooper stating that each of them were "W2 employees" and neither were "1099 wage earners" or "own a business". *See*, a copy of such communication, attached as **Exhibit 10**.

43.     On November 8, 2021, the Thompsons also submitted additional paystubs for Mrs. Thompson's income along with an explanation that she had just started the part-time position and all paystubs in her possession have been provided. *See*, a copy of such correspondence, attached as **Exhibit 11**.

44.     On or about November 12, 2021, Ms. Pinson sent email correspondence stating that all of the documents for the Thompsons' income "have been checked out except for the self-employment income… we received the Letter of Explanation stating you do not own a business but you are a driver and are sub-contracted with Panther whose trucks are owned by Prime Logistics. The Modification Team is requesting a…quarterly Profit and Loss statement advising of your income from this work." *See*, a copy of such communications, attached as **Exhibit 12**.

45.     On November 15, 2021, Mr. Cooper contacted the Thompsons' Bankruptcy counsel as Mr. Cooper claimed to have not received authorization to speak directly with the Thompsons, despite Mr. Cooper previously confirming to the Thompsons that it had received such, and despite the Thompsons' counsel providing such authorization on numerous occasions. *See*, a copy of pertinent communications, attached as **Exhibit 12**.

46.     The Thompsons replied to Ms. Pinson the same day and unequivocally stated that

there is no income from Panther or Prime Logistics for the past quarter because neither of the Thompsons had worked for or with such entities since May 2021 and noted that their new application documents showed all sources of income and that the Thompsons had been W2 employees since June 2021. *See*, a copy of such communications, attached as **Exhibit 13**.

47. On December 3, 2021, Mr. Cooper *again* requested information from the Thompsons that had already been provided, namely, a *third* hardship letter, *additional* paystubs for each of the Thompsons along with an explanation as to Mrs. Thompson's income, and stating that since the Thompsons had provided all of the information requested, that it was expected that Mr. Cooper would review Application #2 for loss mitigation options. *See*, a copy of such communications, attached as **Exhibit 14**.

48. On December 10, 2021, Mr. Cooper phoned the Thompsons to *again* request an explanation that the Thompsons have no self-employment income despite stating so unequivocally both verbally and in writing on multiple occasions.

49. Despite having already complied with Mr. Cooper's latest request, the Thompsons provided written confirmation *again* that they "DO NOT OWN A BUSINESS NOR DO WE TEAM DRIVE FOR ANY COMPANY. We do not and have not had any profit and loss statements since May 2021." *See*, a copy of this communication, attached as **Exhibit 15**.

50. This pattern of repeated requests for information or explanations that had already been provided continued thereafter.

51. On January 27, 2022, the Thompsons sent correspondence to Mr. Cooper at its request *again* explaining the seasonal/part-time nature of Mrs. Thompson's income. *See*, a copy of such letter of explanation, attached as **Exhibit 16**.

52. On or about January 29, 2022, Mr. Cooper sent correspondence to the Thompsons

stating that it finally had all of the information needed to review Application #2. *See*, a copy of such correspondence, attached as **Exhibit 17**.

53. Despite the Thompsons' submission of all requested information and documentation and Mr. Cooper's acknowledgment of the same, as was the case before, Mr. Cooper failed to review the Thompsons' for eligibility for any and all loss mitigation options available to them.

**(Retention of Counsel and Further Attempts to Apply for a Loan Modification)**

54. As the Thompsons had been attempting to work with Mr. Cooper to have a loss mitigation application reviewed for *more than one (1) year* to no avail, the Thompsons sought the assistance of counsel.

55. Mr. Cooper continued to request further information and documentation about Application #2 with which the Thompsons had previously complied, specifically additional pay stubs for each of the Thompsons, a loss mitigation application, and *another* letter of explanation as to the.Thompsons' lack of self-employment income.

56. The Thompsons, through counsel, sent the following pay stubs as follows:

   a. Paystubs for Mrs. Thompson for March 4, 2022 to March 11, 2022 and paystubs for Mr. Thompson for March 4, 2022 to April 15, 2022 on or about April 18, 2022;

   b. Paystubs for Mrs. Thompson for April 4, 2022 to April 22, 2022 on or about April 25, 2022; and,

   c. A paystub for Mr. Thompson dated April 29, 2022 and a paystub for Mrs. Thompson dated May 6, 2022 on or about May 9, 2022.

57. On May 10, 2022, Mr. Cooper *again* sent correspondence to the Thompsons stating

that it finally had all of the information needed to review their loss mitigation application *See*, a copy of such correspondence, attached as **Exhibit 18**.

58.     Finally, on or about May 14, 2022, Mr. Cooper indicated that the Thompsons, after roughly sixteen (16) months of attempting to apply for a loan modification, were approved for a standard modification. *See*, a copy of such correspondence, attached as **Exhibit 19**.

59.     Despite representatives of Mr. Cooper, on numerous occasions, informing the Thompsons that they would be able to reduce their monthly Loan obligations or lower the interest rate on the Loan through a modification, per the terms of the Modification offered, the principal balance of the Loan increased from $148,628.41 to $173,660.05, the Thompsons' monthly payment increased from $791.98, and the interest rate remained constant at 4.625%.

**(Attempts to Obtain Information from Mr. Cooper)**

60.     On April 13, 2022, the Thompsons, through counsel, sent the following pieces of correspondence, all classified as requests for information pursuant to 12 C.F.R. § 1024.36, to Mr. Cooper at the address designated by Mr. Cooper for receipt of requests for information and notices of error pursuant to 12 C.F.R. §§ 1024.36(b) and 1024.35(c) (the "Designated Address"):

     a. Correspondence captioned "Request for Information Pursuant to 12 C.F.R. § 1024.36" seeking additional information concerning the Loan, including a transaction history of the Loan, escrow analyses, and information related to loss mitigation, among other items ("RFI #1"); and

     b. Correspondence captioned "Request for Information Pursuant to 12 C.F.R. § 1024.36 including a request for a payoff statement pursuant to 12 C.F.R. § 1026.36(c)(3)" seeking information concerning the Loan specifically related to loss mitigation documents and communications since March 1,

2020 with a focus on details of live contacts Mr. Cooper had with the

Thompsons ("RFI #2")

*See*, copies of RFI #1 and RFI #2 (the "RFIs"), along with proof of delivery, attached as **Exhibit**

**20** and **Exhibit 21**, respectively.

61.     Mr. Cooper received each of the RFIs at the Designated Address on or before April

19, 2022. *See*, Exhibits 20 and 21.

62.     Mr. Cooper sent correspondence to the Thompsons, through counsel, dated May

14, 2022, purportedly in response to the RFIs (the "RFI Response"). *See*, a copy of the RFI

response, without enclosures, attached as **Exhibit 22**.

63.     Through the RFI Response, Mr. Cooper failed or refused to provide information

requested through the RFIs, including:

a.  Copies of communications and recordings of conversations specifically

concerning loss mitigation attempts since March 1, 2022;

b.  Servicing notes and communication logs concerning the Thompsons'

attempts to obtain loss mitigation;

c.  Copies of the two (2) most recent escrow analyses for the Loan;

d.  The date upon which Mr. Cooper received any loss mitigation applications

from the Thompsons; and,

e.  Any notices sent by Mr. Cooper to the Thompsons indicating whether any

loss mitigation applications submitted were complete, and if incomplete,

stating which documentation was necessary to complete such applications.

*See*, Exhibits 20, 21, and 22.

64.     As a direct and proximate result of Mr. Cooper's failure to respond to the RFIs, on

or about June 2, 2022, the Thompsons, through counsel, sent a notice of error ("NOE #1") to Mr. Cooper at the Designated Address via Certified U.S. Mail and incurred fees, costs, and expenses for the same. A copy of NOE #1, without supporting enclosures, is attached as **Exhibit 23**.

### IMPACT UPON AND DAMAGES SUFFERED BY THE THOMPSONS

65.     Due to Mr. Cooper's lack of reasonable diligence in obtaining a complete loss mitigation application from the Thompsons, since at least July 2021, the Loan accrued upwards of approximately $6,700.00 of additional interest and additional escrow advances in an amount to be determined that would otherwise have not accrued that will be capitalized into the Loan through the modification of the Loan and upon which the Thompsons will have to pay at an interest rate of 4.625% or which otherwise negatively impact the Thompsons' equity in the Home to which they are entitled. *See*, *inter alia*, Exhibit 19.

66.     Mr. Cooper's improper actions caused the Thompsons to suffer from actual damages including, but not limited to:

   a.   Legal fees, costs, and expenses to submit the RFIs and the NOE, to Mr. Cooper in a good faith attempt to obtain information and amicably resolve this matter or to have Mr. Cooper mitigate the harm caused to the Thompsons to which the Thompsons did not receive a proper or adequate response;

   b.   Unwarranted harm to their credit rating and a significant delay in the rehabilitation of his credit for which they have not received proper redress from Mr. Cooper;

   c.   Severe emotional distress driven by Mr. Cooper's actions and by reasonable and justifiable fear that Mr. Cooper's failure to properly handle

the loss mitigation process for the Loan would be the start of a slippery slope leading to the foreclosure sale of their Home unless the Thompsons agree to pay amounts and fees which are not warranted in the form of additional accrued interest and escrow advances, despite the Thompsons' good faith compliance with any and all requests for information necessary to complete a loss mitigation application, which has resulted in frustration, loss of sleep, anxiety, depression, embarrassment, strain to their marital relationship, and other significant emotional distress.

**PATTERN AND PRACTICE OF REGULATION X VIOLATIONS BY MR. COOPER**

67. Mr. Cooper's actions are part of a pattern and practice of behavior in violation of Mullen's rights and in abdication and contravention of Mr. Cooper's obligations under the mortgage servicing regulations set forth in Regulation X of RESPA.

68. As of the filing of this Complaint, consumers nationwide have lodged Seven Thousand Three Hundred Fifty-One (7,351) consumer complaints with the CFPB against Mr. Cooper, specifically concerning the issue identified on the CFPB's consumer complaint database as "loan modification, collection, foreclosure" related to mortgages. Each such complaint is filed and cataloged in the CFPB's publicly accessible online database which can be accessed at the following link: http://www.consumerfinance.gov/data-research/consumer-complaints/.

69. The Thompsons have reviewed the CFPB's consumer complaint database and have identified other similar alleged RESPA violations by Mr. Cooper against other borrowers. In particular, the Thompsons have reviewed the ten (10) consumer complaints attached hereto and identified as **Group Exhibit 24**. The date, details, and a narrative disclosed by the consumer is set

forth in each complaint. The complaints show conduct which demonstrates that Mr. Cooper has engaged in a pattern or practice of violating RESPA with respect to other borrowers.

## COUNT ONE:
## VIOLATIONS OF 12 C.F.R. § 1024.41(b) AND 12 U.S.C. § 2605(k)

**(Failure to exercise reasonable diligence in obtaining a complete loss mitigation application)**

70.     The Thompsons reiterate and incorporate all of the allegations contained in paragraphs 1 through 69 in their entirety, as if fully rewritten herein.

71.     12 C.F.R. § 1024.41(a) provides that "[a] borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (12 U.S.C. 2605(f))."

72.     "A borrower may enforce the provisions of [12 C.F.R. § 1024.41] pursuant to section 6(f) of RESPA (12 U.S.C. §2605(f))". 12 C.F.R. § 1024.41(a).

73.     "A servicer shall exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application." 12 C.F.R. § 1024.41(b)(1).

74.     Comment 1 of the Official Interpretations of the CFPB to 12 C.F.R. § 1024.41(b)(2)(i)(B) provides that "[e]ven if a servicer has informed a borrower that an application is complete (or notified the borrower of specific information necessary to complete an incomplete application), if the servicer determines, in the course of evaluating the loss mitigation application submitted by the borrower, that additional information or a corrected version of a previously submitted document is required, the servicer must promptly request the additional information or corrected document from the borrower pursuant to the reasonable diligence obligation in § 1024.41(b)(1)." Supplement I to Part 1024.

75.     Comment 1 of the Official Interpretations of the CFPB to 12 C.F.R. § 1024.41(b)(3) provides that if no foreclosure sale is scheduled as of the date a loss mitigation application is

received, the application is considered to have been received more than ninety (90) days before any foreclosure sale. Supplement I to Part 1024.

76.     There has been no scheduled foreclosure sale of the Home at any point in time relevant to this Complaint as such, the Thompsons' submission of any loss mitigation applications were deemed to have been received more than ninety (90) days prior to any foreclosure sale of the Home.

77.     The Thompsons first began the process of submitting a loss mitigation application in January 2021.

78.     For months, the Thompsons attempted to comply with Mr. Coopers requests for information necessary to complete their loss mitigation applications, but were consistently met with frustrating obstructions from Mr. Cooper such as, *inter alia*, misplaced documents, requests for information already provided, unclear and contradictory requests or instructions as to what needed to be submitted or what any purported defects were with information submitted as evidenced, *inter alia*, by the following events:

a.   Despite claiming on July 8, 2021, that the Thompsons had submitted all necessary information, on July 18, 2021, Mr. Hrubetz again emailed the Thompsons, this time claiming that the unemployment letter previously acknowledged as sufficient was not sufficient, and requesting other items as well;

b.   Repeatedly requesting authorization from the Thompsons' Bankruptcy counsel to speak directly with the Thompsons despite counsel previously providing such authorization and despite Mr. Cooper having previously confirmed such authorization; and,

    c.   Repeatedly requesting a profit and loss statement and duplicative explanations as to a business which the Thompsons did not own, and in the case of Application #2, through which the Thompsons had not received any pertinent income.

*See*, Exhibits 6, 12, and 15.

79.    As described *supra*, Mr. Cooper failed time and time again to exercise reasonable diligence in collecting documents and information necessary to complete the Application #1 and Application #2, in violation of 12 C.F.R. § 1024.41(b)(1).

80.    Mr. Cooper's actions are part of a pattern and practice of behavior in conscious disregard for the Thompsons' rights.

81.    As a result of Mr. Cooper's actions, Mr. Cooper is liable to the Thompsons for statutory damages and actual damages as further described, *supra*. 12 U.S.C. § 2605(f)(1).

82.    Additionally, the Thompsons request reasonable attorneys' fees and costs incurred in connection with this action. 12 U.S.C. § 2605(f)(3).

## COUNT TWO:
### VIOLATIONS OF 12 C.F.R. § 1024.36 AND 12 U.S.C. § 2605(k)

### (Failure to properly respond to RFI #1 and RFI #2)

83.    The Thompsons reiterate and incorporate all of the allegations contained in paragraphs 1 through 69 in their entirety, as if fully rewritten herein.

84.    Comment 1 of the Official Interpretations of the CFPB to 12 C.F.R. § 1024.36(a) provides that "[a]n information request is submitted by a borrower if the information request is submitted by an agent of the borrower."

85.    A servicer must respond to a request for information by:

(i)  Providing the borrower with the requested information and contact information,

including a telephone number, for further assistance in writing; or

(ii) Conducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.36(d)(1).

86.    Furthermore, a servicer must properly respond to a request for information within

the following deadlines:

A servicer must comply with the requirements of paragraph (d)(1) of this section:

(A) Not later than 10 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives an information request for the identity of, and address or other relevant contact information for, the owner or assignee of a mortgage loan; and

(B) For all other requests for information, not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the information request.

12 C.F.R. § 1024.36(d)(2)(i).

87.    A servicer is not required to comply with 12 C.F.R. § 1024.36(d) if:

(i) Duplicative information. The information requested is substantially the same as information previously requested by the borrower for which the servicer has previously complied with its obligation to respond pursuant to paragraphs (c) and (d) of this section.

(ii) Confidential, proprietary or privileged information. The information requested is confidential, proprietary or privileged.

(iii) Irrelevant information. The information requested is not directly related to the borrower's mortgage loan account.

(iv) Overbroad or unduly burdensome information request. The information request is overbroad or unduly burdensome. An information request is overbroad if a borrower requests that the servicer provide an unreasonable volume of documents or information to a borrower. An information request is unduly burdensome if a diligent servicer could not respond to the information request without either exceeding the maximum time limit permitted by paragraph (d)(2) of this section or incurring costs (or dedicating resources) that would be unreasonable in light of the circumstances. To the extent a servicer can reasonably identify a valid information request in a submission that is otherwise overbroad or unduly burdensome, the servicer shall comply with the requirements of paragraphs (c) and (d) of this section with respect to that requested information.

12 C.F.R. § 1024.36(f)(1).

88.     If a servicer determines it is not required to respond to a request for information because one of the reasons enumerated in 12 C.F.R. § 1024.36(f)(1) is applicable, a servicer must identify the basis for such a determination in its response to the request for information. 12 C.F.R. § 1024.36(f)(2).

89.     Each of the RFIs constitute a request for information as defined by 12 C.F.R. § 1024.36(a) as each is a written request from the Thompsons that included their names, mortgage loan account number, and property address, and requested information related to the Loan. *See* Exhibits 20 and 21.

90.     Mr. Cooper received each of the RFIs at the Designated Address on or before April 19, 2022. *See*, Exhibits 20 and 21.

91.     Mr. Cooper sent the RFI Response on or about May 14, 2022, but did not send any other correspondence consisting of a substantive, supplemental response to either of the RFIs. *See*, Exhibit 22.

92.     Through the RFI Response, Mr. Cooper failed or refused to provide information requested through the RFIs, including:

a.  Copies of communications and recordings of conversations specifically concerning loss mitigation attempts since March 1, 2022;

b.  Servicing notes and communication logs concerning the Thompsons' attempts to obtain loss mitigation;

c.  Copies of the two (2) most recent escrow analyses for the Loan;

d.  The date upon which Mr. Cooper received any loss mitigation applications from the Thompsons; and,

e.  Any notices sent by Mr. Cooper to the Thompsons indicating whether any

loss mitigation applications submitted were complete, and if incomplete,

stating which documentation was necessary to complete such applications.

93.  In relation to such unanswered requests, Mr. Cooper states that "[s]ome information [the Thompsons] have requested such as communication logs, and any written correspondence between Mr. Cooper and [the Thompsons], does not pertain directly to the servicing of the [Loan], does not identify any specific servicing errors, and/or is considered proprietary or confidential." *See*, Exhibit 22.

94.  On its face, Mr. Cooper's determination that it is not required to provide the information requested is not appropriate nor reasonable. *See*, Exhibit 22.

95.  A request for information does not need to "pertain directly to the servicing of the loan" as claimed by Mr. Cooper, rather, the information cannot be "irrelevant" to the Loan at issue. *See*, 12 C.F.R. § 1024.36(f)(1).[2] *See*, Exhibit 22.

96.  There is no requirement in 12 C.F.R. § 1024.36 for a borrower to assert or "identify

---

[2] Comment 1 of the Official Interpretations of the CFPB to 12 C.F.R. § 1024.36(f)(1)(iii) provides:

1.  Examples of irrelevant information. The following are examples of irrelevant information:

    i.  Information that relates to the servicing of mortgage loans other than a borrower's mortgage loan, including information reported to the owner of a mortgage loan regarding individual or aggregate collections for mortgage loans owned by that entity;

    ii.  The servicer's training program for servicing personnel;

    iii.  The servicer's servicing program guide; or

    iv.  Investor instructions or requirements for servicers regarding criteria for negotiating or approving any program with a borrower, including any loss mitigation option.

Supplement I to Part 1024. The requests contained in the RFIs bear no relation to the types of requests the CFPB have determined to be "irrelevant". *See*, Exhibits 20 and 21.

any specific servicing errors" as mistakenly claimed by Mr. Cooper through the RFI Response. *See*, Exhibit 22.

97.     Lastly, the information that Mr. Cooper has refused to provide through the RFI Response is not proprietary or confidential as a significant portion of the information consists of items that Mr. Cooper is required to provide to the Thompsons under 12 C.F.R. 12 C.F.R. § 1024.17 (e.g. escrow analyses) or 12 C.F.R. § 1024.41 (e.g. loss mitigation correspondence), or were otherwise recordings of conversations to which the Borrowers were one of the parties involved—a conversation or correspondence cannot be privileged so as to prevent disclosure to the Thompsons if the Thompsons were one of the parties conversing or to whom the correspondence was sent.*See*, Exhibit 22.

98.     The basis of any determination included in the RFI Response that Mr. Cooper did not need to provide information requested through the RFIs was in bad faith or was otherwise wholly inappropriate.

99.     Mr. Cooper's actions constitute a violation of 12 C.F.R. § 1024.36(d) and 12 U.S.C. § 2605(k)(1)(E) and has caused the Thompsons to suffer actual damages, including, but not limited to incurring attorneys' fees and costs associated with the preparing and sending of NOE #1 (*see* Exhibit 3), which would not have been necessary but for Mr. Cooper's failure to properly respond to the RFI.

100.     Further, Mr. Cooper's failure to comply with 12 C.F.R. § 1024.36(d) caused the Thompsons' attorneys' fees and costs associated with the preparation of the RFI to metamorphose into damages. *Marais v. Chase Home Fin., LLC* (Marais II), 24 F. Supp. 3d 712, 726-728 (S.D. Ohio 2014); *see Marais v. Chase Home Fin. LLC* (Marais I), 736 F.3d 711, 721 (6th Cir. 2013).

101.     Mr. Cooper's actions are part of a pattern and practice of behavior in conscious

disregard for the Thompsons' rights and in abdication of Mr. Cooper's obligations under RESPA and Regulation X.

102.     As a result of Mr. Cooper's actions, Mr. Cooper's is liable to the Thompsons for statutory damages and actual damages as further described, *supra*. 12 U.S.C. § 2605(f)(1).

103.     Additionally, the Thompsons requests reasonable attorneys' fees and costs incurred in filing and maintaining this action. 12 U.S.C. § 2605(f)(3).

**COUNT THREE:**
**VIOLATIONS OF THE RMLA, R.C. 1322.01, *et seq.***

104.     The Thompsons reiterate and incorporate all of the allegations contained in paragraphs 1 through 69 in their entirety, as if fully rewritten herein.

105.     On December 22, 2017, Ohio Governor John Kasich ("Kasich") signed into law Ohio House Bill 199 ("HB 199"), which made significant changes to the former Mortgage Brokers Act, R.C. 1322.01, *et seq.* HB 199 substantially broadened the scope of the statute, now renamed the Residential Mortgage Lending Act, to apply to mortgage lenders.

106.     On December 19, 2018, Kasich signed into law Ohio House Bill 489 ("HB 489"), to again broaden the scope of the RMLA to apply to mortgage servicers. HB 489 now defines "mortgage servicer" and inserts the term into sections throughout Chapter 1322. HB 489's title specifically "require[s] registration of mortgage loan servicers."

107.     Mr. Cooper is subject to the requirements of the RMLA and does not qualify for the exemptions listed in R.C. 1322.04.

108.     "No person ... shall act as a ... mortgage servicer ... without first having obtained a certificate of registration from the superintendent of financial institutions for the principal office and every branch office to be maintained by the person for the transaction of business as a ... mortgage servicer ... in this state." R.C. 1322.07(A).

109.    Mr. Cooper is a mortgage servicer under the RMLA as it "holds the servicing rights, records mortgage payments on its books, or performs other functions to carry out the mortgage holder's obligations or rights under the mortgage agreement." R.C. 1322.01(AA).

110.    Mr. Cooper, as a mortgage servicer, is required to be registered with the Ohio Department of Commerce, Division of Financial Institutions under R.C. 1322.

111.    Mr. Cooper is a registrant under R.C. 1322, as the Ohio Department of Commerce, Division of Financial Institutions has issued it certificates of registration, *inter alia*, License No. RM.850005.000. R.C. 1322.01(GG).

112.    The Thompsons are each a "buyer" as defined by R.C.1322.01(H), as they are individuals whose loan is serviced by a mortgage servicer, Mr. Cooper.

113.    A registrant, licensee, or person required to be registered or licensed under R.C. 1322, *et seq.*, cannot engage in conduct that constitutes improper, fraudulent, or dishonest dealings. R.C. 1322.40(C).

114.    Mr. Cooper violated R.C. 1322.40(C) by engaging in improper and dishonest dealings by failing to exercise reasonable diligence in the loss mitigation process pertaining to the Loan, and by failing to provide the Thompsons and their authorized attorneys, Dann Law, with important responses to their requests for information, instead, improperly claiming that inapplicable exceptions applied to the RFIs.

115.    As a result of Mr. Cooper's conduct, Mr. Cooper is liable to the Thompsons for actual damages, as further described, *supra*, as well as reasonable attorneys' fees and costs incurred in connection with this action and punitive damages. R.C. 1322.52.

116.    A registrant, licensee, or person required to be registered or licensed under R.C. 1322, *et seq.*, is required to comply with all duties imposed by other statutes or common law and:

(2) Follow reasonable and lawful instructions from the buyer; (3) Act with reasonable skill, care, and diligence; [and] (4) Act in good faith and with fair dealing in any transaction, practice, or course of business in connection with the brokering or originating of any residential mortgage loan[.] R.C. 1322.45(A).

117.    A registrant, licensee, or person required to be registered or licensed under R.C. 1322 cannot waive or modify its duties under R.C. 1322.45(A). R.C. 1322.45(C).

118.    Mr. Cooper violated R.C. 1322.45(A)(3) and (4) by failing to act with reasonable skill, care, and diligence and in good faith and with fair dealing when handling the Thompsons' loss mitigation submissions and requests for information, as discussed, *supra*.

119.    As a result of Mr. Cooper's conduct, Mr. Cooper is liable to the Thompsons for actual damages, as further described, *supra*, at ¶ 66, as well as reasonable attorneys' fees and costs incurred in connection with this action and punitive damages. R.C. 1322.45(D).

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs Kathleen Thompson and Jeremy Thompson respectfully request that this Court enter an Order granting Judgment against Defendant Nationstar Mortgage LLC d.b.a. Mr. Cooper as follows:

A.      Actual damages in an amount to be determined at trial for the allegations contained in Counts One through Three;

B.      Statutory damages of Two Thousand Dollars ($2,000.00) per violation of RESPA contained in Counts One and Two for a total of Six Thousand Dollars ($6,000.00);

C.      For punitive damages as to the allegation contained in Count Three;

D.      For costs and reasonable attorneys' fees as to all Counts; and,

E.      For such other relief which this Court may deem appropriate.

## <u>JURY DEMAND</u>

Plaintiffs Kathleen Thompson and Jeremy Thompson hereby respectfully demand a trial by jury on all such claims that may be so tried.

Respectfully submitted,

/s/ *Marc E. Dann*
Marc E. Dann (0039425)
Daniel M. Solar (0085632)
Michael A. Smith, Jr. (0097147)
**Dann Law**
15000 Madison Ave.
Lakewood, OH 44107
Telephone: (216) 373-0539
Facsimile: (216) 373-0536
notices@dannlaw.com
*Counsel for Plaintiffs Kathleen Thompson and Jeremy Thompson*